57 Wn.2d 491 (1961)
358 P.2d 307
HANFORD GUARDS UNION OF AMERICA LOCAL 21 OF THE INTERNATIONAL GUARDS UNION OF AMERICA et al., Appellants,
v.
GENERAL ELECTRIC COMPANY, Respondent.[1]
No. 35301.
The Supreme Court of Washington, Department Two.
January 5, 1961.
Critchlow & Williams, for appellants.
Allen, DeGarmo & Leedy by Gerald DeGarmo, for respondent.
FINLEY, J.
The Hanford Guards Union of America, Local 21, is appealing from the trial court's dismissal of its action for an order directing the General Electric Company to arbitrate a controversy between the parties. The controversy allegedly involves interpretation of provisions of the collective-bargaining contract between the parties and the *492 scope of their agreement to arbitrate such matters. We shall refer to appellant as the Union and to respondent as the Company.
Allen Frazer, a guard at the Company's plant, compiled a record of frequent absenteeism and received a number of warnings from the Company. Supervisory personnel recommended his discharge.[2] On October 21, 1958, he failed to report for duty. When contacted at his residence by his superior officers, Frazer told them that he had been in an automobile accident the preceding night, had been briefly hospitalized, and had asked a nurse to notify the Company that he would be unable to report for work. Further investigation proved the excuse to have been a fabrication. Frazer was discharged as an "undesirable" on October 23, 1958.
The Union sought first to negotiate and then to have the matter submitted to arbitration, claiming the right to do so under provisions of the collective-bargaining agreement between the parties. The Company rejected these overtures *493 on the ground that the agreement did not cover the matter of disciplinary discharges. The Union thereupon brought this action in the trial court, seeking an injunction to compel arbitration.
The arbitration provision of the collective bargaining agreement is Article XIX, which states in part:
"Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XVIII  Grievance Procedure and which involves the interpretation or application of a provision of this Agreement, may be submitted to arbitration provided written application is made ..." (Italics ours.)
The Union contends (1) that certain clauses of the contract must be interpreted in order to determine whether the Company has an unrestricted right to dismiss an employee with or without good cause or is limited by and subject to contractually established grievance and arbitration procedure; and (2) that this question is an arbitrable one, whether or not Frazer was discharged for cause. The Company contends that there is nothing in the collective-bargaining contract to make arbitration necessary or to serve as a guide to an arbitrator.
Many cases may be cited for the proposition that in an action for specific performance of a collective-bargaining agreement the issue of whether a given dispute is arbitrable is to be decided by the court, if the parties have not provided otherwise.
In Local No. 149, Technical Engineers v. General Electric Co. (1st Cir., 1957), 250 F. (2d) 922, the opinion points out that many writers in the labor field urge that the arbitration process would be most effective if the preliminary issue of arbitrability was left to the arbitrator. As to this, the court comments:
"While not ignoring the force of these considerations, it seems to us that they would be persuasive not so much in a case like the present, but rather in inducing the parties to make a voluntary submission to arbitration, and in inducing the parties to include terms in a collective bargaining agreement giving wide scope to the questions to be submitted to arbitration."
*494 The court then concludes as follows:
"But when one of the parties needs the aid of a court, and asks the court for a decree ordering specific performance of a contract to arbitrate, we think that the court, before rendering such a decree, has the inescapable obligation to determine as a preliminary matter that the defendant has contracted to refer such issue to arbitration, and has broken this promise...."
See, also, Brass and Copper Workers Fed. Labor Union 19322 v. American Brass Co. (7th Cir., 1959), 272 F. (2d) 849, and cases cited therein.
[1] In determining whether a dispute is arbitrable under a labor contract, the courts should exercise caution and restraint to avoid usurping the role of the arbitrator by going beyond the question of arbitrability and becoming involved in the merits of a dispute. Likewise, in order to function properly, the courts must be equally careful to refrain from blindly throwing into arbitration every case involving an "arbitration of interpretation" clause simply because the plaintiff proffers an interpretation inconsistent with the conduct of the defendant. When a collective-bargaining agreement provides that disputes involving interpretation of the contract shall be submitted to an arbitrator,[3] the party seeking arbitration need not convince the court that his suggested interpretation is the correct one. That decision is reserved for the arbitrator. To persuade the court that the dispute involves interpretation of the contract the party seeking arbitration must show only that its claim may fairly be said to fall within the scope of the contract. But, clearly, a proposed interpretation is not to be judicially recognized if it is frivolous or patently baseless. International Union, United Automobile, Etc., Workers v. Benton Harbor Malleable Industries (6th Cir., 1957), 242 F. (2d) 536; Local 205, United Electrical, Etc., Workers v. General Electric Co. (1st *495 Cir., 1956), 233 F. (2d) 85; Pari-Mutuel Employees' Guild, Local 280 v. Los Angeles Turf Club, Inc. (1959), 169 Cal. App. (2d) 571, 337 P. (2d) 575. See, also, Greyhound Corp. v. Division 1384, Etc. (1954), 44 Wn. (2d) 808, 271 P. (2d) 689, in which we said:
"... We are convinced that a bona fide dispute, or a debatable question, exists between the parties as to the interpretation of the contract, and that the matter cannot be resolved as a question of law merely by reference to provisions of the collective bargaining agreement cited to us by Greyhound.
"From the views just expressed, it is apparent that Greyhound can find no solace in the cases cited for the proposition that the courts will relieve a party of the obligation of submitting a contentious, frivolous, controversy to arbitration; ..."
We must therefore examine the contentions of the Union, not for the purpose of making the interpretation that has been reserved for the arbitrator, but to determine if the position of the Union is reasonably sound and sufficiently plausible to warrant submitting to arbitration the question of the meaning or interpretation of the contract.
No firm, absolute rule for evaluating the arguments of the party seeking arbitration can be set out, except to emphasize the need for caution and self-restraint in exercising the judicial function in this often hazy but always sensitive area of the law. In Greyhound Corporation, supra, we commented on the dangers inherent in judicial evaluation of the bona fides of a dispute, as follows:
"... Anything less than a cautious application of the rule would permit a party to an arbitration agreement to choose between a judicial forum and an arbitration forum for the settlement of a controversy, notwithstanding his solemn agreement in writing to submit all disputes to arbitration."
A factor to be considered is the unique character of the collective-bargaining process, and contracts resulting therefrom, in which not every potential dispute is attempted to be provided for, and the product of which is designed to be a guide as well as a declaration of rights. Conditions *496 and practices within the industry at the time of negotiation may have been relied upon and expected to continue without unmistakable reference being made to them in the contract. Shulman: Reason, Contract, and Law in Labor Relations, 68 Harv. L. Rev. 999 (1955). Detailed investigation of these problems is for the arbitrator, but the court should be aware of their possible relevance to the dispute before it in order to avoid a too-hasty judicial assignment of legal value and effect to epithets such as "frivolous" or "patently baseless."
With the foregoing in mind, we shall now examine the interpretations of contract language proffered by the Union in the instant case. It places primary reliance on Article II of the contract, which states, in part:
"1. The parties recognize that under this Agreement each of them has responsibilities for the welfare and security of the employees.
"(a) ...
"(b) Subject only to any express limitations stated in this Agreement, or in any other agreement between the Company and the Union, the Company retains the exclusive right to manage its business ..." (Italics ours.)
The position of the Union is (1) that "security" necessarily includes job security, and (2) that there can be no job security unless the Company is precluded from discharging personnel except for good cause. The response of the Company is that it has reserved the exclusive right to manage its business except as expressly limited, and there is no express limitation on the power of the Company to discharge its employees.
[2] Whether limitations on the Company's right to discharge are stated "expressly," or whether the management of the Company's business, as the phrase is used in this subparagraph, includes the firing of employees without cause, is not entirely free from doubt. Other articles in the contract contain guarantees strongly supporting the proposition that the Company would be precluded from discharging a man for certain reasons. Article XIII establishes a typical seniority system, and Article XIV provides for *497 credits for continuity of service. It is anything but clear whether the reservation of the right to manage its business, except as expressly limited, reserves to the Company the right to discharge employees solely for the purpose of breaking their seniority or continuity of service. We doubt that it can be said with certainty that the welfare and security clause, even though followed by the "express limitations" language, could not fairly mean that the Company is barred from discharging employees without cause.
We express no firm opinion and do not decide the question as to whether, in the final analysis, the contract requires that the Company must have good cause to discharge an employee. We do feel that the position of the Union cannot be branded "frivolous" or "patently baseless." We are convinced the dispute is one that involves interpretation of the contract. The Company has promised to submit such disputes to arbitration. It should do so. In other words, problems of contract interpretation have by contract been reserved for arbitration. The courts should avoid unnecessary interference in the contractually created, highly specialized, jurisdiction of the labor arbitrator.
The Company's final argument is that assuming (1) that the issue of whether the Company must have good cause to discharge an employee is a proper subject for arbitration, and (2) that the arbitrator would decide that the Company must have good cause, the existence of good cause to discharge Frazer is so clear that the grievance is frivolous and patently baseless. (If good cause is a prerequisite to the discharge of an employee, it would follow that the application of the particular facts of a case to the "good cause" standard would require an interpretation of the meaning of the standard and the express clauses of the contract from which it is implied.)
[3] There is authority for the position that, even though the scope of the arbitration clause clearly encompasses the subject matter of a dispute, a court should not decree that the parties arbitrate the grievance, if, on the merits, there is only one possible conclusion for the arbitrator to reach. United Steelworkers v. American Mfg. Co. *498 (6th Cir., 1959), 264 F. (2d) 624; Engineers Ass'n v. Sperry Gyroscope Co. (2d Cir., 1957), 251 F. (2d) 133; Annot., 24 A.L.R. (2d) 752, 762. However, it has been held elsewhere, and we think more correctly, that, if the parties have promised to submit the subject matter to arbitration, the court should not consider the merits, but should enforce the mutual promises and leave consideration even in the clearest cases to the arbitrator. Local 1912, International Ass'n of Machinists v. United States Potash Co. (10th Cir., 1959), 270 F. (2d) 496; New Bedford Defense Products Division of the Firestone Tire & Rubber Co. v. Local No. 1113, United Automobile, Etc., Workers (1st Cir., 1958), 258 F. (2d) 522. See, also, Local 205, United Electrical, Etc., Workers v. General Electric Co. (D.C. Mass., 1959), 172 F. Supp. 53. It is the evaluation and conclusion of the arbitrator, and not those of the courts, that the parties have promised to abide by. There is no reason why, in the face of their solemn agreement, the parties should be given an alternative of invoking the time consuming and costly machinery of the courts in lieu of the relative expedience of an arbitration proceeding. In the New Bedford case, supra, the position of the arbitrator is analogized to that of the court: once it is found that the court has jurisdiction over the subject matter of a controversy, that jurisdiction is not lost simply because the proper disposition of the claim is crystal clear. If the parties have promised to arbitrate, the court should not refuse to enforce the contract because the solution seems simple.
For the foregoing reasons, the judgment of the trial court should be reversed and the case remanded with directions to order the parties to proceed with arbitration. It is so ordered.
WEAVER, C.J., MALLERY, ROSELLINI, and FOSTER, JJ., concur.
March 13, 1961. Petition for rehearing denied.
NOTES
[1] Reported in 358 P. (2d) 307.
[2] On October 30, 1957, the Company issued to Frazer the following disciplinary notice:

"According to our records you have been absent from work a total of forty-one working days, from January 1st, 1956 to October the 27th, 1957. Your supervisor has on a number of times discussed your absentee record with you. On the third and twenty-third days of July, 1956 you were given warning notices and five working days off without pay. Again on August the third, 1957 you were given a warning notice and five working days off without pay, in an attempt to get you to improve your absentee record, but to no avail. We feel that your attendance record is not the result of ill health, rather from improper rest, loss of sleep, and the use of intoxicating liquors. This is to advise you that your attendance record must be improved, or it will be necessary to recommend that you be relieved of your Job responsibility with the Security Patrol Operation."
Frazer was not absent from work from October 27, 1957, through January 24, 1958, and perhaps until a later date. On March 29, 1958, Frazer again failed to report for work. His senior officer recommended that he be discharged. In May 1958, the following report was issued:
"Mr. A. Frazer 3309 was assigned to building and file check on 5/11/58. He started on assignment at approximately 8.30 AM and did not contact Hdqtrs. and give the condition of building and files checked untile approximately 12.20 PM. When asked why he made no reports Mr. Frazer stated `I forgot to call'. The normal procedure at that time was to call in each exclusion area as the check was Completed."
The next recorded incident was that of October 21, 1958.
[3] For a discussion of the difference between the scope of an agreement to arbitrate "disputes concerning the interpretation and application" of the contract and the scope of an undertaking to arbitrate "any dispute, difference, disagreement or controversy of any nature or character," see Cox: Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1500-07 (1959).