163 P.3d 807 (2007)
Larry NELSON, and the marital community composed of Larry and Barbara Nelson, Respondent,
v.
WESTPORT SHIPYARD, INC., a Washington corporation, j. orin edson, individually and his marital community composed of orin and Charlene edson; daryl wakefieLd, individually and his marital community composed of daryl and kim wakefield, Appellants.
No. 35308-3-II.
Court of Appeals of Washington, Division 2.
August 7, 2007.
*808 Victoria Lynn Vreeland, Gordon Thomas Honeywell Malanca Peterson, Seattle, WA, James Walter Beck, Gordon Thomas Honeywell, Tacoma, WA, for Respondent.
Gail Eileen Mautner, D. Michael Reilly, Lane Powell PC, Seattle, WA, Michael Barr King, Talmadge Law Group PLLC, Tukwila, WA, for Appellants.
HUNT, J.
¶ 1 Westport Shipyards, Inc., a closely held corporation, appeals a pretrial superior court ruling denying its motion to compel arbitration of the shareholder claims included in employee-shareholder-director Larry Nelson's multi-claim lawsuit against Westport. As Westport notes, Nelson's six causes of action include a combination of shareholder-based and employee-based claims, including *809 fiduciary breach and minority shareholder oppression. More specifically, in his sixth cause of action for duress, coercion, and misrepresentation, Nelson seeks to nullify the 2004 Shareholders Agreement, which contains an arbitration clause. Citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), Westport argues that, under their 2004 Shareholders Agreement with Nelson, "claims regarding enforcement or breach of the Shareholders Agreement, whether asserted by Mr. Nelson or Defendants, must be referred to arbitration for resolution."[1] Clerk's Papers (CP) at 392.
¶ 2 We hold that Buckeye does not apply to compel arbitration as broadly as Westport asserts, particularly with respect to Nelson's challenge to the validity of the 2004 Shareholders Agreement as a whole. But we do agree with Westport that the shareholders' "unresolvable difference" triggered the buy-sell provisions of the 2004 Shareholders Agreement; therefore, we hold that the price Westport must pay Nelson to buy back his shares is subject to arbitration under the Agreement. Accordingly, we affirm in part, reverse in part, and remand for arbitration of the repurchase price for Nelson's Westport shares under the 2004 Shareholders Agreement.

FACTS

I. Background
¶ 3 Westport Shipyards is a closely held Washington corporation that manufactures and sells motor-yachts. In 1983, Larry Nelson began working for Westport as a laminator. Over the years, he worked his way up to become Vice President, Director, and Chairman of the Board.

A. Shareholder Agreements
¶ 4 In 1998, Westport's shareholders, including J. Orin Edson and President Daryl Wakefield, offered Nelson the opportunity to become a shareholder. As part of the resulting 1998 Purchase Agreement, Nelson agreed to sell any shares he purchased back to Westport if his employment with the company ever ceased.
¶ 5 Over the next three years, Nelson continued to purchase additional shares of Westport. In both December 2000 and December 2001, Nelson and Westport executed two more Purchase Agreements. In total, Nelson paid $327,833 to acquire 460 shares, approximately two percent, of Westport stock.
¶ 6 In 2004, Westport and Nelson executed a Shareholders Agreement, in which (1) Nelson agreed to sell his shares back to Westport "upon the unresolvable difference between shareholders," Section 2.3.3, CP at 45, or "upon the termination . . . of [his] employment," Section 2.3.4, CP at 45; and (2) Westport agreed to repurchase Nelson's shares at the greater of either one and one-half times their book value or Nelson's original purchase price. This 2004 Shareholders Agreement stated, "[It] shall be governed by, and interpreted and construed under, the laws of the State of Washington." Section 6.4, CP at 52.
¶ 7 This 2004 Shareholders Agreement also contained an arbitration clause, Section 6.5, which provided:
In the event of any disputes among any of the parties arising out of this Agreement, then such disputes shall be submitted to arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. In the event the parties to such dispute are unable to agree upon an arbitrator, then said Association shall submit a list of proposed arbitrators and the parties to such dispute shall alternately strike a name from such list until the final arbitrator remains, who shall be final and binding upon the parties. The cost of such arbitrator shall be born equally by the parties.
Section 6.5, CP at 52 (emphasis added). It is this 2004 Shareholders Agreement and its arbitration clause that precipitated the instant litigation.

*810 B. Nelson's Termination
¶ 8 On April 29, 2005, Nelson experienced an undisclosed medical emergency. Nelson was then Westport's Chairman of the Board of Directors, Vice President of Administration, Secretary, and Registered Agent. Nelson continued to work at Westport full-time.
¶ 9 On May 7, 2005, Westport's majority shareholder, J. Orin Edson, raised the subject of early retirement with Nelson, referring to Nelson's medical problems. On May 18, Westport's President, Daryl Wakefield, told Nelson he was to take a paid leave of absence. Nelson told Westport he had no desire or plan to retire and there were no medical restrictions on his work activities. At a Special Meeting of the Board of Directors and Shareholders on June 8, Westport decided to terminate Nelson's employment. Wakefield notified Nelson in writing on June 17.
¶ 10 Following Nelson's termination, Westport informed him that his termination had triggered its right under the 2004 Shareholders Agreement to repurchase his shares at one and one-half times their book value[2] and that it was exercising this right. Nelson rejected Westport's tendered payment of $1,086,570, and he refused to sell his shares back to Westport.
¶ 11 Two months later, the other Westport shareholders voted to require Nelson to sell back his shares, triggered by the "unresolvable difference" provision of the 2004 Shareholders Agreement. Nelson continued to refuse to tender his shares to Westport for its repurchase.
¶ 12 In a letter from Wakefield, Westport then notified Nelson of its intent to commence arbitration "to enforce the terms of the Agreement and to require the sale of [his] 460 shares. . . ." CP at 116.

II. Lawsuit
¶ 13 Nelson sued Westport in Grays Harbor County Superior Court. He alleged six causes of action, emanating from his general claim that Westport had illegally terminated his employment: (1) disability discrimination, seeking damages; (2) breach of implied contract of employment, seeking damages; (3) wrongful withholding of wages, seeking back pay; (4) breach of fiduciary duties and minority shareholder oppression; (5) tortious interference with a business expectancy; and (6) duress, coercion and misrepresentation, seeking to invalidate the 2004 Shareholders Agreement.
¶ 14 In August 2005, Westport moved to compel arbitration of Nelson's claims arising under the 2004 Shareholders Agreement. The trial court denied Westport's motion to compel arbitration "[a]t this stage." In an October 31 letter opinion, the court stated:
There is no indication that the parties agreed to arbitrate the type of claims set forth in the amended complaint. One cause of action challenges the validity of the Shareholders Agreement. I do not know if the claim has any merit, but I do conclude that such claim is not covered by the arbitration clause in the Shareholders Agreement.
CP at 132. Westport moved for clarification and asked the trial court to rule that Westport was not barred from arbitrating its breach of contract claim against Nelson. The trial court denied this motion and declined to clarify the scope of its order and letter opinion. Westport did not seek interlocutory appellate review of either of these two pre-trial rulings.
¶ 15 Westport then began discovery, including taking Nelson's deposition, and filed pretrial motions. During Nelson's deposition, Westport learned that Nelson was not claiming misrepresentation about the Westport shares buy back price formula, and that *811 he had agreed to the 2004 Shareholders Agreement arbitration provision.
¶ 16 During this period, the United States Supreme Court filed Buckeye, 546 U.S. 440, 126 S.Ct. 1204, holding that challenges to a contract containing an arbitration clause, but not challenges to the clause itself separate from the underlying contract, must be arbitrated. Buckeye, 546 U.S. at 449, 126 S.Ct. 1204. Based on Buckeye and Westport's pretrial discovery of more details about Nelson's claims, Westport again moved to compel arbitration, emphasizing that it sought to compel arbitration of only those claims arising from the 2004 Shareholders Agreement, including Nelson's sixth cause of actionfor duress, coercion, and misrepresentation challenging the validity of the 2004 Shareholders Agreement.[3] Again, the trial court denied Westport's motion to compel arbitration.[4]

III. Appeal
¶ 17 Westport appealed the trial court's denial of its second motion to compel arbitration, arguing that Buckeye controls. Nelson moved to dismiss Westport's appeal, arguing that (1) the appeal was untimely because Westport had failed to appeal the trial court's earlier order denying its first motion to compel arbitration; and (2) Westport had waived its right to appeal because, after the trial court denied its motion to compel arbitration, Westport had engaged in discovery and had further litigated Nelson's claims.
¶ 18 Our court commissioner denied Nelson's motion to dismiss Westport's appeal. Our commissioner ruled that (1) Westport's failure to appeal the trial court's order denying Westport's first motion to compel arbitration did not bar Westport from bringing its second motion to compel because the trial court's first order had stated it was denying the motion "at this stage" of the litigation, implying that its order was not final; and (2) Westport's ongoing discovery did not operate to waive its right to appeal because this conduct was not inconsistent with Westport's intention to continue to seek arbitration.
¶ 19 Nelson moved to modify our commissioner's denial of his motion to dismiss Westport's appeal. We denied Nelson's motion to modify.[5] Westport's appeal now proceeds on its merits.

ANALYSIS
¶ 20 Westport contends that the trial court erred in denying its motion to compel arbitration. Westport argues two primary grounds: (1) Buckeye requires that a challenge to the enforceability of an agreement containing an arbitration clause, like Nelson's sixth cause of action, as opposed to a challenge to the arbitration clause itself, is a matter for the arbitrator, and not the court, to decide; and (2) the trial court erred when it determined that the claims, counterclaims, and defenses arising out of the 2004 Shareholders Agreement, and related to Nelson's fourth cause of action, are not arbitrable.
¶ 21 Nelson responds that the trial court correctly ruled (1) the question of overall contract validity is for the courts, not an arbitrator, to decide; and (2) his claims did not fall under the 2004 Shareholders Agreement's "narrow" arbitration clause. We address each argument in turn.

I. Nelson's Sixth Cause of Action
¶ 22 We disagree with Westport that Buckeye controls and renders arbitrable Nelson's challenge to the 2004 Shareholders Agreement's validity.

A. Buckeye's Stated Holding
¶ 23 Buckeye was a retail business that cashed checks in exchange for a customer's *812 personal check and payment of a fee. Each time Buckeye provided this service, the customer signed an agreement that contained the following arbitration provision:
By signing this Agreement, you agree that if a dispute of any kind arises out of this Agreement or your application therefore or any instrument relating thereto, then either you or we or third-parties involved can choose to have that dispute resolved by binding arbitration.
Any claim, dispute, or controversy . . . arising from or relating to this Agreement . . . or the validity, enforceabilty, or scope of this Arbitration Provision or the entire Agreement, . . . shall be resolved, upon the election of you or us or said third-parties, by binding arbitration. . . . This arbitration Agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act.
Buckeye, 546 U.S. at 442-43, 126 S.Ct. 1204 (emphasis added).
¶ 24 Cardegna brought a putative class action against Buckeye in a Florida state court, challenging the validity of the entire Buckeye-customer agreement. Cardegna alleged that Buckeye charged usurious interest rates and, therefore, the whole agreement violated Florida lending and consumer-protection laws. Id. at 443, 126 S.Ct. 1204. Buckeye moved to compel arbitration under the agreement's arbitration clause. Ruling that a court, not an arbitrator, resolves a void contract claim ab initio, the trial court denied the motion. Id. The intermediate Florida appellate court reversed, holding that a question of the contract's legality should go to the arbitrator. The Florida Supreme Court reversed the appellate court, reasoning that "to enforce an agreement to arbitrate in a contract challenged as unlawful `could breathe life into a contract that not only violates state law, but also is criminal in nature. . . .' [Cardegna v. Buckeye Check Cashing, Inc.,] 894 So.2d 860, 862 ([Fla.] 2005) [citations omitted]." Buckeye, 546 U.S. at 443, 126 S.Ct. 1204.
¶ 25 The United States Supreme Court granted certiorari, disagreed with Florida's trial court and Supreme Court, and pronounced a sweeping holding. Following its previous rationale in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Buckeye Court distinguished between a claim that a contract's arbitration clause was induced by illegality and a claim that the entire contract was induced by illegality. Buckeye, 546 U.S. at 445, 126 S.Ct. 1204. The Court noted:
[W]e held [in Prima Paint] that if the claim is fraud in the inducement of the arbitration clause itself . . . the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.
Id. The Buckeye Court further stated:
[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. . . . [T]his arbitration law applies in state as well as federal courts. . . . [W]e conclude that because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court.
Id. at 445-46, 126 S.Ct. 1204.
¶ 26 Westport is correct that, on the surface at least, this broad Buckeye language appears to control here. On closer reading, however, we note that Buckeye's underlying facts distinguish it from our case and, therefore, we hold that Buckeye does not control the facts here.[6]

B. Buckeye's Facts
¶ 27 In accordance with longstanding common law practice, we must read Buckeye's purported holding against its significantly different factual backdrop. First, the agreement at issue in Buckeye represented the *813 entire relationship between the two parties Buckeye's check-cashing service and its customer, limited to a single check-cashing transaction. Here, in contrast, Westport and Nelson had 22 years of ongoing employer-employee, corporation-shareholder, and corporation-director relationships, distinct from the narrow 2004 Shareholders Agreement at issue here, which, by it own terms, covers only the transfer of Westport shares.
¶ 28 Second, the arbitration provision in the Buckeye check-cashing customer agreement specifically provided for binding arbitration, "governed by the Federal Arbitration Act," Id. at 445-46, 126 S.Ct. 1204, (see 9 U.S.C. §§ 1-16), of two distinct types of disputes: (1) "[a]ny claim, dispute, or controversy . . . arising from or relating to this Agreement," and (2) "[a]ny claim, dispute, or controversy . . . arising from or relating to the validity, enforceability, or scope of this Arbitration Provision or the entire Agreement." Id. at 442-43, 126 S.Ct. 1204 (emphasis added).
¶ 29 In contrast, the 2004 Shareholders Agreement at issue here is much narrower and requires arbitration of only those disputes "arising out of this Agreement." Unlike the arbitration provision in Buckeye, the 2004 Shareholders Agreement arbitration clause does not expressly encompass disputes about the validity, enforceability, or scope of the Agreement as a whole; nor does it encompass disputes about the validity, enforceability, or scope of the arbitration clause in particular. In our view, this distinction is critical to our holding that Buckeye does not apply here.
¶ 30 In further contrast with the Buckeye customer agreement, the 2004 Shareholders Agreement at issue here expressly provides that (1) Washington state law governs the Agreement, including questions relating to its interpretation and construction; and (2) the Commercial Arbitration Rules of the American Arbitration Association govern disputes under the Agreement submitted to arbitration. Unlike the Buckeye agreement, the 2004 Shareholders Agreement nowhere mentions the Federal Arbitration Act.
¶ 31 Our Supreme Court recently warned us not to treat haphazardly as dispositive its rulings that do not "answe[r] the question presented in the case at bar." State v. Frost, ___ Wash.2d ___, 161 P.3d 361, 367 (2007). In Frost, the Court addresses the conundrum facing lower courts trying to interpret the scope of a higher court's express language that appears, at first, to apply to a new case with seemingly analogous facts. In correcting both lower courts' misapprehension of its prior holdings, the Court notes:
Nothing in [our previous] opinion was directed toward answering the question presented in the case at bar. Yet, the trial court and the Court of Appeals treated this case as though it were dispositive.
Frost, 161 P.3d at 367. The Court further notes that, although there is language in both of its prior opinions "suggesting" the principles on which the lower courts relied, "these cases do not necessarily stand for the proposition" that the lower courts gleaned from these prior holdings. Id. Finally, the Frost Court "reject[s] the reading of [its two prior decisions] adopted below," "narrowly interpret[s] this precedent as applied to the present case," id. pronounces a new narrower application of its earlier ruling, and reverses the lower courts.
¶ 32 We apply similar judicial caution and precision here. We read the sweeping language of Buckeye's overly-broad holding, together with the express broadly-inclusive arbitration provision in Buckeye's check-cashing customer agreement. And we respectfully conclude that the United States Supreme Court did not intend the broad language of its Buckeye holding to apply to contracts far narrower in scope like the 2004 Shareholders Agreement, whose arbitration clause lacks Buckeye's inclusion of contract-validity issues among those disputes expressly subject to arbitration.
¶ 33 Moreover, the Buckeye Court pronounced its holding under circumstances prompting it to note that Buckeye's check-cashing service involved interstate commerce and that federal law applied, even if contrary to state law, under the express terms of *814 Buckeye's customer agreement.[7] Again, such is not the case here. Our case involves a local, closely held corporation, and the terms of the 2004 Shareholders Agreement expressly provide that Washington state law applies.
¶ 34 Accordingly, we hold that (1) because Buckeye is distinguishable on its facts, the language of its broadly stated holding does not control here; (2) therefore, Buckeye does not require the parties' dispute over the enforceability of the 2004 Shareholders Agreement to go to arbitration; and (3) the trial court correctly ruled that the court, not the arbitrator, should resolve the parties' disputes about the enforceability of the 2004 Shareholders Agreement in general and Nelson's sixth cause of actionfor duress, coercion, and misrepresentationin particular.

II. Nelson's Fourth Cause of Action
¶ 35 In contrast with Nelson's sixth cause of action, his fourth cause of action for breach of fiduciary duties and minority shareholder oppressiondoes not challenge the 2004 Shareholders Agreement's validity. Rather, Nelson's fourth cause of action requires us to determine whether the 2004 Shareholders Agreement's arbitration clause covers his claims for fiduciary breach or minority shareholder oppression.
¶ 36 We hold as a matter of law that, in general, the 2004 Shareholders Agreement does not cover disputes over fiduciary breach or minority shareholder oppression. But we also hold that, to the extent that Nelson's fourth cause of action includes a dispute over the price at which he must sell back his shares to Westport following a triggering event,[8] this dispute "aris[es] out of" the [2004 Shareholders] Agreement and, therefore, this price dispute is subject to arbitration under section 6.5 of the Agreement.

A. Standard of Review
¶ 37 Just as we review the trial court's interpretation of any other contractual provision, we review the trial court's determination of a dispute's arbitrability de novo. See, e.g., In re Bubble Up Delaware, Inc., 684 F.2d 1259, 1264 (9th Cir.1982). Like the trial court, we look to the language of the agreement to determine the scope of the arbitration clause. Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, 370 U.S. 254, 256, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); Mediterranean Enter. v. Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir.1983).
¶ 38 Mediterranean supports the general rule that whether and what the parties have agreed to arbitrate is an issue for the courts to decide unless otherwise stipulated by the parties. See, e.g., John Wiley & Sons v. Livingston, 376 U.S. 543, 546-47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). The parties' chosen language provides the basis for this determination.[9] Similarly, in Tacoma Narrows Constructors v. Nippon Steel-Kawada Bridge, 138 Wash.App. 203, 156 P.3d 293 (2007), we recently addressed whether the court or an arbitrator should resolve the parties' dispute over the scope of a specific dispute resolution provision, which included arbitration, and whether particular disputes were subject to arbitration under this provision. In affirming the trial court's ruling denying a motion to compel arbitration, we cited and applied the general rule of arbitrability: Whether and what the parties have *815 agreed to arbitrate is an issue for the courts to decide unless otherwise stipulated by the parties. Tacoma Narrows Constructors, 138 Wash.App. 203, 156 P.3d 293.
¶ 39 As with the broad language of Buckeye's holding and Mediterranean, we read our Tacoma Narrows Constructors holding narrowly against the factual backdrop of that case. And, as we note above, the Tacoma Narrows Constructors parties' contract contained an explicit dispute-resolution provision allowing the general contractor to exclude from arbitration certain disputes related to disputes being litigated in court. As with the Buckeye agreement and arbitration provision, the language of the Tacoma Narrows Constructors contract and its explicit arbitration provision distinguish that case from the one before us. Thus, we do not apply Tacoma Narrows Constructors, as Nelson advocates, to allow the trial court to determine, in the first instance, whether the repurchase price of Nelson's Westport stock is subject to arbitration under the 2004 Shareholders Agreement. Instead, we apply the plain language of the 2004 Shareholders Agreement, including its arbitration clause.

B. 2004 Shareholders Agreement Arbitration Clause
¶ 40 Because our review is de novo, we must determine whether the 2004 Shareholders Agreement arbitration clause, to which Nelson and Westport agreed, covers disputes about breach of fiduciary duties and minority shareholder oppression. In so doing, we look to the plain language of the arbitration clause itself, which says that it applies to disputes "arising out of this Agreement."
¶ 41 The 2004 Shareholders Agreement embodies the parties' intentions for the transfer of Westport shares. It covers no other relationship between the parties, and it does not purport to cover their employment and other business relationships. Instead, the Agreement (1) limits the transferability of Westport shares; (2) includes the original purchase price for shares held by current Shareholders, including Nelson; and (3) includes a provision whereby Westport has the right to repurchase shares in the event any shareholder terminates employment or there is an unresolvable difference between shareholders. It is undisputed that there is an unresolvable difference between shareholders.[10]
¶ 42 The 2004 Shareholders Agreement does not grant any additional shareholder rights. Nor does it define the Board of Directors' duties towards shareholders in general or Nelson in particular. Rather, by its own terms, the Agreement is limited in scope to the acquisition, sale, and other transfer of Westport shares.
¶ 43 Accordingly, we hold that the 2004 Shareholders Agreement arbitration clause does not generally encompass Nelson's fourth cause of action for the Directors' breach of fiduciary duties and minority shareholder oppression except to the extent this cause of action includes the price that Westport must pay Nelson to buy back his shares. Applying the plain language of the 2004 Shareholders Agreement, we hold (1) the parties' unresolvable differences triggered the buy-sell provision of the Agreement, Section 2.3.3, CP at 45; (2) insofar as Nelson disputes the purchase price that Westport tendered for his shares, Section 2.4, CP at 46, this dispute is one "arising under the Agreement," Section 6.5, CP 52; and (3) therefore, the dispute over the price at which Nelson must sell his shares to Westport is subject to arbitration under Section 6.5 of the Agreement. CP at 52. We further hold that none of Nelson's other claims are subject to arbitration under this Agreement; instead, the trial court will resolve those claims.
¶ 44 Accordingly, we affirm in part, reverse in part, and remand for arbitration of the price at which Nelson must sell his shares back to Westport under the 2004 Shareholders Agreement.
We concur: BRIDGEWATER, P.J., and QUINN-BRINTNALL, J.
NOTES
[1] Westport acknowledges that Nelson's claims not "arising out of" the 2004 Shareholders Agreement, including claims of oppression and breach of fiduciary duty, are not subject to arbitration and, therefore, remain before the trial court.
[2] Section 2.4 of the Agreement provided for Westport's repurchase of Nelson's shares at the greater of the price paid for the shares . . . or one and one-half times the book value.

. . . .
based upon the latest annual audited financial statement the Corporation issued prior to the event giving rise to the Corporation's . . . responsibility to purchase the shares. . . . The [Corporation's] independent certified public accountant's determination of book value shall be conclusive and binding on all parties.
CP at 46-47.
[3] Westport did not seek to arbitrate Nelson's other causes of action, unrelated to the 2004 Shareholders Agreement, which included claims for wrongful termination, wage withholding, tortious interference with a business expectation, and breach of fiduciary duties and minority shareholder oppression (except to whatever extent these claims were being used as a means of avoiding enforcement of the Agreement).
[4] The trial court's written order does not include findings of fact. Nor did the trial court issue an oral ruling from the bench.
[5] Having previously denied Nelson's motion to dismiss Westport's appeal as untimely, we do not consider it again. See RAP 17.2(a)(2) and 17.7.
[6] See Sacher v. United States, 343 U.S. 1, 8, 72 S.Ct. 451, 96 L.Ed. 717 (1952) (distinguishing facts diminish precedential value). See also Floyd v. Dep't of Labor and Indus., 44 Wash.2d 560, 565, 269 P.2d 563 (1954).
[7] Similarly, the cases on which Westport relies and which the Buckeye Court cited, Prima Paint, 388 U.S. 395, 87 S.Ct. 1801, and Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) arise from very different facts and they include issues of interstate commerce, which put them squarely under the Federal Arbitration Act. 9 U.S.C. §§ 1-16.
[8] At oral argument, Nelson acknowledged what is evident from the recordthat there was, and is, an "unresolvable difference between shareholders" over the legality and propriety of his termination from employment. We note that this dispute, though subject to resolution by the trial court, nevertheless triggers the 2004 Shareholders Agreement Buy-Sell Provisions. And it is the triggering of the Buy-Sell Provisions that precipitated the dispute over the price that Westport must pay Nelson to buy back his shares under the Agreement.
[9] We note, however, that although Mediterranean is helpful in determining whether portions of Nelson's fourth cause of action fall under the 2004 Shareholders Agreement arbitration clause, Mediterranean is immaterial to resolving the question of whether a trial court should generally submit disputes of contract validity to the arbitrator.
[10] Accordingly, we need not address the alternative triggering event under the 2004 Shareholders Agreement, Nelson's termination from employment, which Nelson argues was unlawful and, therefore, not a legitimate trigger to activate the Buy-Sell Provision of the Agreement.