# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of: ) | DIVISION ONE |
| ) | |
| LISA R. PASCALE, ) | No. 68103-6-I |
| ) | |
| Respondent, ) | |
| ) | PUBLISHED OPINION |
| and ) | |
| ) | |
| MICHAEL J. PASCALE, ) | |
| ) | |
| Appellant. ) | FILED: February 25, 2013 |
| _____ ) | |

DWYER, J. — The uniform arbitration act (UAA) stipulates that a "court may not refuse to order arbitration because the claim subject to arbitration lacks merit or grounds for the claim have not been established." RCW 7.04A.070(3). Instead, when determining whether a dispute must be arbitrated, the court must limit its inquiry to the question of whether that dispute falls within the scope of the parties' agreement to arbitrate. If it can be fairly said that the arbitration agreement covers the dispute, arbitration is required.

Here, the trial court improperly reached the merits of the parties' dispute in refusing to order arbitration. Moreover, because the subject of that dispute clearly fell within the scope of the broad arbitration provision to which the parties contracted, arbitration was in fact required. Accordingly, we reverse and remand.

I

Lisa Pascale and Michael Pascale[1] filed a joint petition for dissolution of their marriage on February 15, 2011. On September 6, 2011, the parties participated in mediation before Harry R. Slusher. At the conclusion of the one-day mediation, they executed a "stipulation and agreement" pursuant to Civil Rule (CR) 2A. The CR 2A agreement, which was signed by Lisa and Michael, their attorneys, and Slusher, included sections pertaining to a parenting plan for the parties' two sons, child support, spousal maintenance, and the division of property. Section 13(g) of the agreement—relating to the issue of spousal maintenance—was hand-drafted by Slusher. This section, which is reproduced below, stated that Michael would pay to Lisa the following:[2]

| amount | | duration | |
|---|---|---|---|
| ~~9500~~ /mo. x | | 48 | months |
| ~~9500~~ 8500 | | 22 | |
| then 7500 | | 14 | |
| then 5000 | | 12 | |

The CR 2A agreement further specified that "[e]ach party understands that even though final documents yet need to be prepared this stipulation and

---

[1] In order to avoid confusion, Lisa Pascale and Michael Pascale are referred to as Lisa and Michael, respectively.

[2] In addition, in order "[t]o settle all aspects of this case," the CR 2A agreement stipulated that Michael would pay to Lisa $1,666 per month for 29 months beginning at the conclusion of the spousal maintenance schedule set forth in section 13(g). The agreement noted that "[f]or tax purposes, this will also be spousal maintenance." There is no challenge pertaining to this component of the spousal maintenance agreement.

agreement is effective and binding upon execution and enforceable in court." In addition, the agreement contained an arbitration clause stipulating that "[a]ny disputes in the drafting of the final documents or any other aspect of this agreement (form or substance), or any issue not discussed shall be submitted to Harry R. Slusher for binding arbitration."

As contemplated by the CR 2A agreement, following the conclusion of the mediation, Michael drafted the final documents and submitted them to Lisa to be entered in court. However, because Lisa did not agree that the proposed documents embodied the agreement of the parties as set forth in the settlement agreement, she did not present the documents to the court for entry. Instead, Lisa filed a motion to enforce the CR 2A agreement in superior court.

In her motion to enforce, Lisa alleged that Michael had misrepresented the parties' agreement regarding the duration of spousal maintenance. As drafted by Michael, the section pertaining to maintenance stated:

Spousal maintenance shall be provided as follows:

|      | Amount | Duration  |
|------|--------|-----------|
|      | $9500  | 22 months |
| then | $7500  | 14 months |
| then | $5000  | 12 months |
|      |        |           |
| TOTAL |       | 48 months |

In contrast to the four years (48 months) of maintenance specified in Michael's proposed final dissolution documents, Lisa asserted that section 13 of the CR 2A agreement in fact provided for eight years (96 months) of spousal maintenance. She contended that the draft proposed by Michael eliminated the first 48 months

of maintenance at $9,500 per month. Thus, she asked the court to approve entry of final dissolution documents awarding her eight years of maintenance.

Michael thereafter filed a cross-motion asking the court to order the parties to binding arbitration or, in the alternative, to enter the final documents that he had proposed. In addition, he sought an award of attorney fees against Lisa pursuant to CR 11, alleging that her motion to enforce was made in bad faith. Lisa, in turn, requested an award of attorney fees based upon having to respond to Michael's motion.

The trial court granted Lisa's motion to enforce the CR 2A agreement, ruling that section 13 of the agreement awarded 96 months of maintenance. The court explained that "[t]he written document is clear on its face. Extrinsic evidence may not be used to modify an agreement that is clear on its face." Based upon this determination, the court also denied Michael's motion to compel arbitration. The trial court explained that "[t]here is no arbitrable dispute because of the Court's findings and conclusions regarding the CR 2A Agreement." The court thereafter awarded attorney fees to Lisa, explaining that her motion "was warranted by the facts and law."

Michael appeals.

II

Michael first contends that, because a court is not permitted to consider the underlying merits of a dispute in determining the arbitrability of that dispute, the trial court erred by denying his motion to compel arbitration based upon its determination that the spousal maintenance provision was clear on its face. We

- 4 -

agree.

Normal contract principles apply to the interpretation of a CR 2A agreement. Morris v. Maks, 69 Wn. App. 865, 868, 850 P.2d 1357 (1993). We review de novo a trial court's interpretation of the language of a contract. Knipschield v. C-J Recreation, Inc., 74 Wn. App. 212, 215, 872 P.2d 1102 (1994). A trial court's determination regarding the arbitrability of a dispute is also reviewed de novo. Heights at Issaquah Ridge Owners Ass'n v. Burton Landscape Grp., Inc., 148 Wn. App. 400, 404, 200 P.3d 254 (2009); Stein v. Geonerco, Inc., 105 Wn. App. 41, 45, 17 P.3d 1266 (2001).

"Washington law vests courts with the power to determine 'whether . . . a controversy is subject to an agreement to arbitrate.'" Saleemi v. Doctor's Assocs., Inc., ___ Wn.2d ___, 292 P.3d 108, ¶ 13 (2013) (quoting RCW 7.04A.060(2)). The arbitrability of a dispute is determined by examining the arbitration agreement between the parties. Heights, 148 Wn. App. at 403. If the reviewing court "can fairly say that the parties' arbitration agreement covers the dispute, the inquiry ends because Washington strongly favors arbitration." Davis v. Gen. Dynamics Land Sys., 152 Wn. App. 715, 718, 217 P.3d 1191 (2009); Mendez v. Palm Harbor Homes, Inc., 111 Wn. App. 446, 454, 45 P.3d 594 (2002). Any doubts regarding the applicability of an arbitration agreement "should be resolved in favor of coverage." Heights, 148 Wn. App. at 405 (citing Peninsula Sch. Dist. No. 401 v. Pub. Sch. Emps. of Peninsula, 130 Wn.2d 401, 413-14, 924 P.2d 13 (1996)).

Furthermore, as the UAA makes clear, a court "may not refuse to order

arbitration because the claim subject to arbitration lacks merit or grounds for the claim have not been established." RCW 7.04A.070(3). "'Although it is the court's duty to determine whether the parties have agreed to arbitrate a particular dispute, the court cannot decide the merits of the controversy, but may determine only whether the grievant has made a claim which *on its face* is governed by the contract.'" Peninsula, 130 Wn.2d at 413 (alteration in original) (quoting Council of County & City Emps. v. Spokane County, 32 Wn. App. 422, 424-25, 647 P.2d 1058 (1982)). As our Supreme Court first explained in 1961:

> [I]f the parties have promised to submit the subject matter to arbitration, the court should not consider the merits, but should enforce the mutual promises and leave consideration even in the clearest cases to the arbitrator. It is the evaluation and conclusion of the arbitrator, and not those of the courts, that the parties have promised to abide by. There is no reason why, in the face of their solemn agreement, the parties should be given an alternative of invoking the time consuming and costly machinery of the courts in lieu of the relative expedience of an arbitration proceeding. . . . If the parties have promised to arbitrate, the court should not refuse to enforce the contract because the solution seems simple.

Hanford Guards Union of Am., Local 21 of Int'l. Guards Union of Am. v. Gen. Elec. Co., 57 Wn.2d 491, 498, 358 P.2d 307 (1961) (citations omitted).

Here, the trial court determined that "a dispute arose between the parties regarding . . . Section 13 of the CR 2A Agreement relating to spousal support." As the court characterized it, this dispute involved the "wife['s] assert[ion] that the agreement requires the husband to pay spousal support in decreasing amounts for a total of 96 months" and "the husband['s] conten[tion] that the parties' agreement was that he would pay spousal support for only 48 months." The trial court then determined that the dispute was not arbitrable because "[t]he written

document is clear on its face."

In so ruling, however, the trial court improperly examined the merits of the controversy. As noted above, a court must resolve "the threshold legal question of arbitrability of the dispute by examining the arbitration agreement without inquiry into the merits of the dispute." Heights, 148 Wn. App. at 403. Here, the subject of the parties' dispute was the meaning of the CR 2A agreement's spousal maintenance provision. However, in determining the arbitrability of that dispute, the trial court turned, not to the arbitration agreement, but directly to the language of the spousal maintenance provision. Because, the trial court concluded, this language was "clear on its face," the court determined that there was no dispute subject to the agreement to arbitrate.

This was error. Where the parties have agreed to arbitrate a matter, a court must "leave consideration even in the clearest cases to the arbitrator." Hanford Guards, 57 Wn.2d at 498. A court may not refuse to order arbitration on the basis that the claim lacks merit. RCW 7.04A.070(3). Here, because the trial court chose to examine the merits of the parties' dispute in determining the threshold question of arbitrability, the court's method of analysis was erroneous.

Instead, in determining the arbitrability of this dispute, the proper question is only whether the dispute regarding the spousal maintenance provision falls within the scope of the arbitration provision. That question must be resolved by examining the language of the arbitration agreement itself. Heights, 148 Wn. App. at 403. Here, the CR 2A agreement provides that "[a]ny disputes in the drafting of the final documents or any other aspect of this agreement (form or

substance), or any issue not discussed shall be submitted to Harry R. Slusher for binding arbitration." At minimum, this provision requires the arbitration of disputes pertaining to the drafting of the final documents, disputes as to either the "form or substance" of the CR 2A agreement, and disputes pertaining to any issue not discussed by the parties during the mediation.

The parties' dispute clearly falls within the broad scope of this arbitration provision. This dispute pertains both to the drafting of the final documents and to the substance of the CR 2A agreement. Lisa's disagreement with Michael arose from his allegedly improper drafting of the final dissolution documents, a matter that is expressly encompassed within the agreement to arbitrate. Moreover, it is the meaning of the spousal maintenance provision—a matter pertaining to the "substance" of the CR 2A agreement—that lies at the heart of the dispute. Given that any doubts regarding the applicability of the arbitration agreement must be resolved in favor of coverage, and because it may be fairly said "that the parties' arbitration agreement covers the dispute," no further inquiry into the merits was permissible.[3] Davis, 152 Wn. App. at 718. Arbitration of the dispute was thus required.

This is a prudent and sensible rule. The primary purposes of arbitration are "speed and convenience." Saleemi, 292 P.3d 108, at ¶ 20. Any inquiry into

---

[3] Lisa contends that the alleged dispute concerns only the enforcement of the CR 2A agreement, a subject which, she asserts, is expressly excluded from the parties' agreement to arbitrate. Lisa is correct that the CR 2A agreement specifies that "this stipulation and agreement is effective and binding upon execution and enforceable in court." However, this case does not involve the simple matter of enforcing an undisputed contractual term. Instead, the parties' dispute concerns the meaning of the contractual language contained within their agreement. Because this dispute pertains to the substance of the CR 2A agreement—a matter falling squarely within the ambit of the arbitration provision—arbitration is required.

the merits of a dispute necessarily involves "the time consuming and costly machinery of the courts," Hanford Guards, 57 Wn.2d at 498—exactly the outcome that our state's strong presumption in favor of arbitration seeks to avoid. Indeed, in this case, the trial court's examination of the merits of the dispute well-illustrates these costs and delays.

Here, the trial court, in its order issued on December 2, 2011, explained that the spousal maintenance provision was not arbitrable because the contract language was "clear on its face." Unlike the trial court, however, we discern no clarity in the handwritten spousal maintenance provision. On the one hand, by striking only the term "$9500/month" and not the term "48 months" in the first line of the provision, the parties may have intended, as Lisa asserts, that the term "$9500/month" in the *second* line of the provision be multiplied both by the term "22 months" in the second line and the term "48 months" in the first line. In such an event, the total period of maintenance would extend for 96 months. On the other hand, the strikethrough of the term "$9500/month" in the first line of the provision could indicate, as Michael asserts, that the parties intended that this line of the provision be stricken in its entirety. Under this interpretation, the term "$9500/month" in the second line of the provision would be multiplied only by the term "22 months" in the second line, and the total period of spousal maintenance would extend for only 48 months. Given that multiple reasonable interpretations of the contractual language exist, we cannot say, as the trial court believed, that the spousal maintenance provision is unambiguous.

Thus, even were we to review the merits in determining the arbitrability of

- 9 -

the dispute, as Lisa requests, because the agreement is not clear on its face, arbitration would still be required. And, after more than a year of costly litigation, the parties would find themselves in exactly the same position in which they began. Such a result could easily have been avoided had the trial court complied with the statutory mandate and declined to analyze the merits of the controversy.[4]

Because the subjects of the parties' dispute—the drafting of the final dissolution papers and the meaning of the spousal maintenance provision— plainly fall within the scope of the arbitration clause, the trial court erred by determining that there was no arbitrable dispute and denying Michael's motion to compel arbitration.

III

Lisa nevertheless contends that if the spousal maintenance provision does not unambiguously provide for 96 months of maintenance, as she asserts, then the CR 2A agreement must be set aside for lack of mutual assent or because it was unfair at the time of its execution. We disagree.

As an initial matter, the trial court did not reach the question of the CR 2A agreement's enforceability and the record is largely silent with respect to this issue. We will not abrogate the written agreement of the parties in the absence of a developed record. Moreover, because, as discussed above, it is the

---

[4] Indeed, in this case, the arbitrator is uniquely well-situated to resolve this dispute. Having personally observed the negotiation of the parties during mediation, he is best positioned to properly discern the intent of the parties regarding the meaning of the spousal maintenance provision.

- 10 -

arbitrator who must determine the meaning of the spousal maintenance provision, any ruling regarding the fairness of that provision would be premature.

More importantly, however, the enforceability of the CR 2A agreement, like the parties' dispute regarding the substance of the spousal maintenance provision, is a matter for an arbitrator and not a court. Lisa relies on <u>Nelson v. Westport Shipyard, Inc.</u>, 140 Wn. App. 102, 163 P.3d 807 (2007), for the proposition that a court, and not an arbitrator, should determine the enforceability of a contractual agreement. This reliance, however, is misplaced.

In <u>Nelson</u>, Division Three of this court held that a challenge to the validity of a contract (based upon allegations of fraud, coercion, and misrepresentation) was not subject to a provision requiring the arbitration of disputes "'arising out of [the] Agreement.'" 140 Wn. App. at 113-14. However, the arbitration agreement considered in <u>Nelson</u> predated the adoption of the UAA, which governs all arbitration agreements entered into after January 1, 2006. RCW 7.04A.030. The UAA stipulates that it is the arbitrator who must determine "whether a contract containing a valid agreement to arbitrate is enforceable." RCW 7.04A.060(3). As our Supreme Court has observed, unless a challenge relates only and specifically to the arbitration clause itself, the enforceability of the contract is "'a matter reserved for the arbitrator.'" <u>Townsend v. Quadrant Corp.</u>, 173 Wn.2d 451, 460, 268 P.3d 917 (2012) (quoting <u>Townsend v. Quadrant Corp</u>, 153 Wn. App. 870, 885, 224 P.3d 818 (2009)).

Here, the arbitration provision requires the arbitration of disputes relating to any aspect of the form or substance of the CR 2A agreement. Lisa has lodged

no challenge to the validity of this broad arbitration provision. Instead, she challenges the validity of the CR 2A agreement itself. The question of that agreement's enforceability, however, is a matter for the arbitrator to resolve. RCW 7.04A.060. Accordingly, Lisa's claims of unfairness and lack of mutual assent must be addressed by the arbitrator and not by the court.

IV

Michael contends that the trial court erred by awarding attorney fees to Lisa. Given our resolution of the issues in this case, we agree and, accordingly, vacate the trial court's award of attorney fees to Lisa. Moreover, we agree that neither party is entitled to attorney fees on appeal. A meritorious issue has been raised, and neither party demonstrates an ability to pay that is far exceeded by that of the other party. Finally, we see no abuse of discretion in the trial court's decision to deny Michael's request for CR 11 sanctions. Consequently, we will not disturb that decision.

Reversed and remanded.

We concur:

- 12 -