# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MARY C. HRUDKAJ, TABITHA GRABARCZYK, PAMELA E. OWENS, AND JOI CAUDILL, | No.  52984-0-II |
| Respondents, | |
| v. | |
| QUEEN ANN WATER WORKS, LLC, AND GERARD A. FITZPATRICK AND CATHERINE FITZPATRICK, | UNPUBLISHED OPINION |
| Appellants. | |

LEE, C.J. — Queen Ann Water Works, LLC, Gerard Fitzpatrick, and Catherine Fitzpatrick appeal the trial court's rulings, arguing that the trial court erred by 1) failing to enforce the CR 2A agreement and written agreement memorializing the CR 2A agreement read into the trial court's record, 2) awarding attorney fees to Respondents, 3) appointing a receiver without making findings required by RCW 7.60.025, 4) ruling that they had violated Sections 5 and 7 of the Beneficiary Contract, and 5) ruling that their assessments were improper.

We hold that the trial court erred by failing to enforce the parties' CR 2A agreement placed on the record before the trial court.  Accordingly, we reverse the trial court's Findings of Fact and Conclusions of Law; Memorandum Decision, Findings of Fact and Conclusions of Law re: Award

of Attorney's Fees; and Judgment and Order, and we remand to the trial court to enforce the CR 2A agreement that was placed on the record before the trial court.

FACTS

Mary C. Hrudkaj, Tabitha Grabarczyk (deceased), Pamela Culy (formerly Pamela Owens), and Joi Caudill (collectively "Respondents") filed suit for contractual breaches against Queen Ann Water Works, LLC and Gerard and Catherine Fitzpatrick (collectively "Fitzpatrick"). Gerard and Catherine Fitzpatrick own and manage Queen Ann Water Works, LLC, a private water system (Queen Ann water system).

A.      HISTORY OF THE QUEEN ANN WATER SYSTEM

Peter and Jean Bakker (Bakkers) developed the Queen Ann-Hill Division of Belfair View Estates (Estate), a 50-acre plot of land, containing eighteen lots. As part of the development of the Estate, the Bakkers obtained a water right from the State of Washington for five acre-feet of water per year with 14 water hookups permitted.

The lots in the Estate are subject to the Declaration of Protective Covenants for Queen Ann-Hill Division of Belfair View Estates (Protective Covenants). Under the Protective Covenants, the lots in the Estate are burdened by the restriction that the Queen Ann water system must be the sole provider of water. And the Protective Covenants are binding on future lot owners, their heirs, successors, and assigns of the Estate.

The Bakkers also executed a Declaration of Water Service for Queen Ann-Hill Water Division of Belfair View Estates (Declaration of Water Service) on the same day as the Protective Covenants in 1992. The Declaration of Water Service laid out the terms and conditions relating

to the Queen Ann water system for the Bakkers and their successors in interest, as well as for the future owners of the eighteen lots in the Estate and their successors in interest.

On June 24, 1994, the Bakkers executed a Third Party Beneficiary Contract Agreement (Beneficiary Contract). The Beneficiary Contract was for the benefit of present and future owners of lots in the Estate served by the Queen Ann water system and their mortgage holders.

After Peter Bakker's death in 2004, his son in law, Robert Smalser, took over management of the Queen Ann water system. Smalser initially hired Gerard Fitzpatrick to operate the Queen Ann water system in 2007. By 2008, Gerald and Catherine Fitzpatrick became the owners of the Queen Ann water system.

B.      GOVERNING CONTRACTS

The Protective Covenants, Declaration of Water Service, and Beneficiary Contract all run with the land. The Protective Covenants executed by the Bakkers state, in relevant part:

> WATER SERVICE. Water is provided by [the Bakkers] to the land described herein. Under no circumstances shall additional water wells be drilled on the lands described on page 1 of this document; [the Bakkers'] private water system shall be the sole provider of water. Water shall be provided by execution of an individual water agreement between [the Bakkers] and the Property Owner who purchases a portion of the land, described on Exhibit A.

Ex. 2 at 2.

The Declaration of Water Service was between the Bakkers and the future property owners of the Estate. The Declaration of Water Service states, in relevant part:

> 3.3     BAKKER may charge additional fees known as assessments for unexpected nonrecurring repairs. Such assessments shall be charged to all according to the percentage of their hookup(s) in relation to the total number of hookups sold including standby hookups. No Property Owner shall be billed more than One hundred fifty dollars ($150.00) per hookup in any one month for such additional assessments. However, in the event that the assessment

3

totals more than One hundred fifty dollars ($150.00) per month per hookup, BAKKER may charge each Property Owner for each hookup up to One hundred fifty dollars ($150.00) per month each until such time as the total assessment shall be paid. No such assessment shall be made until such time as BAKKER has installed the required equipment/well apparatus or made the repairs and such work is performed in accordance with the laws of the State of Washington, Department of Social and Health Services.

. . . .

11.1 In the event legal action is brought by BAKKER or their assigns as owner of the water system, the supply lines up to the "point of hookup" herein described and which includes the well and pumping apparatus and tanks, against the Property Owner or their successors in interest, for any reason arising out of the Agreement, the Property Owner or his/her assigns agree to pay, in addition to any judgment or obligation, a reasonable attorney's fee and costs of suit. Any judgment rendered in favor of BAKKER shall be a lien against the land of the Property Owner described herein. Said lien may be foreclosed upon and the property sold pursuant to the laws of the State of Washington. Venue shall be in Mason County regardless of whether any other court has concurrent jurisdiction.

Ex. 3 at 2, 4.

The Beneficiary Contract was between the Bakkers and third party beneficiaries of the property purchasers (i.e., mortgage or title companies of the property purchasers). The Beneficiary Contract states, in relevant part:

WHEREAS, the [Bakkers] hereby warrants that existing and future encumbrances, liens or other indebtedness, if any, to the title of water supply systems now owned or hereafter acquired by the [Bakkers] shall be subordinated and made subject to this Agreement.

. . . .

Section 2. . . .

(a) The [Bakkers] shall supply at all times and under adequate pressure for the use of each of the properties, duly connected to its water supply system a sufficient quantity of water to meet the reasonable needs of each of the properties duly connected to said water supply systems. Such water shall be of the quality

4

and purity as shall meet the 1974 Safe Drinking Water Act of the U.S. Environmental Protection Agency (EPA), . . . In the event said Board shall determine that the purity of the water does not meet the aforesaid Standards, the [Bakkers] shall immediately at its sole cost and expense make any adjustment, repair, installation, or improvement to its facilities that shall be necessary or required or recommended by said Board to bring the purity of the water up to said Standards.

. . . .

Section 5.

In the event the [Bakkers] should fail to operate and maintain the water supply systems in the manner and under the conditions specified herein (failure due to Acts of God, natural disasters or other causes beyond the control of the [Bakkers], including labor troubles or strikes, excepted) or in the even [sic] the [Bakkers] collects or attempts to collect from the consumers of water charges in excess of the rate or rates specified or provided for in this Agreement, then in either of such contingencies, if such default shall continue for a period of thirty (30) days (or for a period of two (2) days in the event such default consists of a shutdown of the water or suspension of water services, except for the causes above set forth) after written notice to the [Bakkers] by any consumer, mortgagees, or by any person for whose benefit this contract is made, then and in such event any such person for whose benefit this contract is made, may enforce this Agreement by action, instituted for such purpose in any court of competent jurisdiction and in such action shall be entitled as a matter of right to the entry of an order appointing a receiver or other officer appointed by the court to take immediate possession of the water supply systems of the [Bakkers] for the purpose of operating and maintaining the same with the full right to hold, use, operate, manage and control the same for the benefit of the parties for whom this Agreement is made, with full right to collect the charges for services at rates not in excess of those specified or provided for in this Agreement. Such receiver or other officer of the Court, during the period of its operation, shall be entitled to such reasonable compensation and expenses, including reasonable attorneys' fees, as may be determined by the Court.

. . . .

Section 7.

Changes in the initial rates described in Section 4 hereof may be proposed by the [Bakkers] and by third party beneficiaries of this Agreement in the following manner:

If within ninety (90) days after notice to the Representative and to all parties connected to the water supply systems of a rate change proposed by the [Bakkers], not more than one-third of such parties have signified in writing their opposition to such proposed rate change, the [Bakkers] may forthwith establish such new rates. If more than one-third of such parties signify, in writing, their opposition to a rate change proposed by the [Bakkers], or if more than one-third of such parties proposed in writing a rate change which the [Bakkers] approves, and the parties cannot negotiate an agreement within ninety (90) days to the reasonableness of the new rates, then the matter of the reasonableness of such new rates shall be referred to arbiters selected as follows: The [Bakkers] shall designate one arbiter, the objecting parties shall designate one arbiter, and the two arbiters thus selected shall chose a third arbiter. The three arbiters shall me [sic] their written recommendations to the parties to the dispute as to the reasonableness of the new rates within ninety (90) days after the reference of the dispute to them. Written notice of the hearing of the dispute by the arbiters shall be given to the [Bakkers] and to all objecting parties. All proceedings before the arbiters shall be recorded in writing. Either side to the arbitration may present written objections to the recommendations within thirty (30) days after the decision. If no written objections are made, it shall be considered that all parties agreed that the new rates recommended by the arbiters are reasonable. If written objections are filed by either side, the questions of the reasonableness of the new rates shall be the subject of review by a court of competent jurisdiction in appropriate legal proceedings initiated for such purpose. In the event of arbitration of court proceeding the proposed change of rates shall be held in abeyance and shall not become effective until the conclusion of such proceedings.

Ex. 1 at 1-4.

C.     WATER RATES

When Gerard and Catherine Fitzpatrick took over the Queen Ann water system in 2008, the water rate was $20 per month. Fitzpatrick increased the rate to $35 per month effective March 1, 2008. Fitzpatrick again raised the rates to $36 and $37 in 2010 and 2011, respectively.

On September 30, 2012, Fitzpatrick issued notice that the water rate would increase from $37 to $42, effective November 1, 2012. Five water users, including Respondents, objected to the rate increase and requested arbitration under Section 7 of the Beneficiary Contract. Fitzpatrick did not respond to the objection and increased the water rate to $42.

6

Also on September 30, Fitzpatrick notified the water users that a $3,300 assessment will be charged for removing large trees at the wellhead, repairing vandalism to the wellhead, and installing lighting at the wellhead to deter vandalism. Fitzpatrick did not provide proof of payment or that the work had been completed as required by Section 3.3 of the Declaration of Water Service.

D.    COMPLAINT

Respondents filed a complaint against Fitzpatrick on January 22, 2013. The complaint alleged that Fitzpatrick improperly raised water rates and imposed assessments in violation of existing agreements. Respondents sought an injunction and permanent restraining order against Fitzpatrick to prevent improper assessments and water rate increases, appointment of a receiver as allowed for in the Beneficiary Contract, damages, and attorney fees and costs.

During the course of the lawsuit, on November 30, 2014, Fitzpatrick gave notice that the water rate would again increase to $47 per month, effective March 1, 2015. Seven users, including Respondents, objected. Fitzpatrick responded by saying a meeting will be planned with the water system users, but a date for the meeting was never provided, and the water rate was increased to $47 per month on March 1.

E.    NOVEMBER 12, 2015 AGREEMENT ON THE RECORD

On November 12, 2015, the day trial was scheduled to begin, the parties reached an agreement and orally presented their agreement to the judge in open court. The parties stated that they had reached agreement on the "principles" of their agreement, but they had not finalized the wording of the agreement. Verbatim Report of Proceeding (VRP) (Nov. 12, 2015) at 2.

The parties agreed that the Protective Covenants, Declaration of Water Service, and Beneficiary Contract were applicable to the settlement of the matter and that Fitzpatrick will abide

by the terms of those agreements. The parties also agreed that previously agreed to amendments to the applicable agreements will be attached to a written settlement agreement and will be made a part of the applicable documents. The parties further agreed to (1) Fitzpatrick releasing 3 liens he had filed against properties; (2) accepting the September 30, 2012 water rate increase to $42, which will become effective on the date of the signing of the agreement with no retroactive payments; (3) Fitzpatrick providing proof that the September 30, 2012 special assessments were done and the amounts paid within 30 days, and once proof is provided, Respondents will pay the special assessment on a monthly basis; (4) having the November 2015 water rate increase go through the process outlined in the applicable documents, and if no agreement can be reached, the matter will proceed to a dispute resolution process outlined in the Beneficiary Contract; (5) eliminating "door knock fees" for delivering notices to Fitzpatrick's customers; (6) not charging existing customers for any future expansion of the water system; (7) requiring Fitzpatrick to present a financial plan for the creation of an emergency fund to cover emergency repairs to the water system and have a second party signature for those funds; (8) requiring that proof of work being done be provided within 90 days after any notice of special assessments; (9) refrain from blocking the roadway or harassing each other; (10) dismiss the lawsuit; (11) each party paying their own attorney fees; (12) the agreement being binding on all parties; (13) not having any prior waiver be considered a continuing waiver; (14) including a dispute resolution clause; (15) including a severability clause; (16) the parties having authority to sign the document memorializing the agreement; and (17) the agreement having an effective date of the date the last signature is obtained on the settlement document memorializing the agreed terms before the court.

The parties also discussed providing the trial court with a signed written settlement agreement within 2 weeks. The trial court directed the parties to have a written motion and order for dismissal in the court file by December 4.

F.  WRITTEN SETTLEMENT AGREEMENT

Respondents drafted, and Fitzpatrick signed, a written settlement agreement. The written agreement reflected the terms agreed to on the record before the trial court, including the three applicable agreements the parties agreed to abide by, the amendments to those agreements the parties had previously agreed to, the release of liens, the 2012 rate increase, the 2015 rate increase, the special assessments, the door knock fees, future expansion of the water system, a financial plan for an emergency fund, an agreement to refrain from blocking the roadway or harassing the other party, the severability clause, the dismissal of the lawsuit, attorney fees, the binding effect of the agreement, waivers, dispute resolution, and the authority of the parties to enter into the agreement.

G.  MOTION FOR NON-CR 2A STATUS

Although they drafted the written settlement agreement, Respondents did not sign the agreement. Instead, Respondents filed a motion for non-CR 2A status, which came on for hearing on August 29, 2016. Respondents argued that the parties only read into the record a "basic framework" and it was not a completed agreement. VRP (Aug. 29, 2016) at 2. Respondents also argued that because the parties did not agree to all the terms of the agreement, the agreement was not complete. According to Respondents, the parties had continued negotiating after the agreement was placed on the record on November 2015. Respondents further argued that there was no "mutual assent" as required under contract law. VRP (Aug. 29, 2016) at 6.

Fitzpatrick argued that on July 25, 2016, Respondents sent him a final version of the written settlement agreement. Fitzpatrick signed the document on July 26. Fitzpatrick asserted that

> [n]ow when you compare that document that was signed by my clients on July 26 compared to what was written into the court—spoken into the court record on November of last year, it's—every item that was mentioned in that agreement is an item that is mentioned in the settlement agreement. There's no new items in the settlement agreement. And there was, I would say, changes. But there was no changes in the principle of any of the items that were brought forth.

VRP (Aug. 29, 2016) at 7.

The trial court ruled that the written settlement agreement was not signed by both parties, so it was not effective under CR 2A. The trial court noted that several matters had not been agreed to when the parties' agreement was placed on the record before the trial court: "the special assessment for tree cutting, the special assessment in general, notice provisions for that, and that the payment plan for paying back the amount of the special assessment for tree cutting." VRP (Aug. 29, 2016) at 14-15. The trial court also noted that the agreement placed on the record was "not a bare outline of how the agreement will look. They are very specific, and they're agreed to." VRP (Aug. 29, 2016) at 15. But the trial court ruled that

> there are material matters in the four or five areas that agreement was not yet read into the record as to where the parties, and if they agree on the special assessment, for tree cutting, if they agree on the notice for special assessments. They haven't agreed definitely on the payment plan. And the severability clause, we don't know what's being severed and not severed, which I'm thinking [Respondents' counsel] is—brought up an issue that I didn't see here at all, and that is if things go south, then they can go back and re-litigate the things that they've already agreed to here.
> So the Court does find overall that even though there are a number of things that are very clearly read into the record and very clearly agreed to, that are material elements of this total agreement that are not present in the written—it's not a written, it was an oral—orally read into the record, attempt at a full settlement.
> So the Court does find that the provisions that were read into the record on November 12, 2015, just prior to trial, do not bind the parties. They do not fully set forth a full agreement to settle the matter.

VRP (Aug. 29, 2016) at 15-16. Because the trial court found the agreement read into the record before the court did not fully set forth a full agreement to settle the matter and did not bind the parties, the court invalidated the agreement and set a new trial date.

Fitzpatrick filed a motion for reconsideration on September 8, 2016. The trial court denied the motion because Fitzpatrick's arguments were a repeat of the arguments made in response to the Respondents' motion for non-CR 2A status.

H.      BENCH TRIAL

A bench trial was held to resolve the case. The trial began on September 21, 2016, and concluded on January 31, 2018.[1] VRP 11; CP 248. The trial court entered Findings of Fact and Conclusions of Law; a Memorandum Decision, Findings of Fact and Conclusions of Law re: Award of Attorney Fees; and a Judgment and Order in favor of the Respondents.

Fitzgerald appeals.

ANALYSIS

A.      CR 2A AGREEMENT

Fitzpatrick argues that the trial court erred by not upholding the CR 2A settlement agreement placed on the record before the trial court and the subsequent written settlement agreement memorializing the agreement that was placed on the record. We agree.

---

[1] Plaintiff Tabitha Grabarczyk had passed away since the complaint was filed, so the representative of her estate was present.

11

    1.      Enforceability of CR 2A Agreement on the Record

CR 2A states:

    No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

RCW 2.44.010 states:

    An attorney and counselor has authority:

    (1) To bind his or her client in any of the proceedings in an action or special proceeding by his or her agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by him or her, or signed by the party against whom the same is alleged, or his or her attorney[.]

We review the trial court's decision to enforce a settlement agreement pursuant to CR 2A and RCW 2.44.010 under the abuse of discretion standard. *Morris v. Maks*, 69 Wn. App. 865, 868, 850 P.2d 1357, *review denied*, 122 Wn.2d 1020 (1993). An abuse of discretion occurs when a decision of the trial court is manifestly unreasonable or based on untenable grounds or reasons. *Id.* A trial court abuses its discretion when it erroneously interprets a contract. *See Bauman v. Turpen*, 139 Wn. App. 78, 93-94, 160 P.3d 1050 (2007).

An informal agreement may be "sufficient to establish a contract even though the parties contemplate signing a more formal written agreement" in certain circumstances. *Morris*, 69 Wn. App. at 869. To determine whether the informal agreement is enforceable, we consider "whether (1) the subject matter has been agreed upon, (2) the terms are all stated in the informal writings,

and (3) the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract." *Id*.

"[T]he fact that the parties contemplated drafting a formal settlement agreement does not necessarily mean that they intended to be bound only upon execution of that document." *Id*. at 872. "If the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain, then a contract exists between them by virtue of the informal writings, even though they may contemplate that a more formal contract shall be subsequently executed and delivered." *Loewi v. Long*, 76 Wn. 480, 484, 136 P. 673 (1913).

The rules of contract interpretation apply to a CR 2A agreement. *In re Marriage of Pascale*, 173 Wn. App. 836, 841, 295 P.3d 805 (2013). Absent disputed facts, the legal effect of a contract is a question of law we review de novo. *Matter of Estate of Petelle*, 195 Wn.2d 661, 665, 462 P.3d 848 (2020).

Our primary goal is to ascertain the intent of the parties. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). We determine intent by focusing on the objective manifestation of the parties in the written contract. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Accordingly, we consider only what the parties wrote; giving words in a contract their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent. *Id.* at 503-04. A contract "should be construed as a whole and, if reasonably possible, in a way that effectuates all of its provisions." *Colo. Structures, Inc. v. Ins. Co. of the W.*, 161 Wn.2d 577, 588, 167 P.3d 1125 (2007).

An enforceable contract requires "a mutual intention or 'meeting of the minds' on the essential terms of the agreement." *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn.

App. 846, 851, 22 P.3d 804 (2001). The terms agreed to must be sufficiently definite. *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 178, 94 P.3d 945 (2004). If an offer is so indefinite that a court cannot decide just what it means and fix exactly the legal liability of the parties, acceptance does not result in an enforceable contract. *Sandeman v. Sayres*, 50 Wn.2d 539, 541, 314 P.2d 428 (1957).

a.  Subject matter

Here, the parties represented to the trial court that they agreed to the applicable governing agreements, the amendments to the governing agreements from the 2014 mediation, the release of three liens, the 2012 rate increase, the assessment for tree cutting, the 2015 rate increase, the door knock fees, the future expansion terms, the financial plan for an emergency fund, the management of the special assessments, refraining from blocking the roadway or harassing the other party, the dismissal of the lawsuit, attorney fees, the binding effect of the agreement, waivers, and dispute resolution, severability of the contract provisions, parties' authority to sign, and effective date of a written agreement. Thus, the record shows that the parties had agreed to the subject matter in the agreement and placed that agreement on the record.

b.  Terms agreed upon

The trial court found that there were "four or five areas that agreement was not yet read into the record." VRP (Aug. 29, 2016) at 15. However, the trial court only specified that the documentation deadline and payment plan for the tree cutting assessment, the notice and payment plan for the special assessment, and what the severability clause applied to had not been agreed upon when the agreement was placed on the record.

14

### i.    Tree cutting assessment

The trial court found that the parties had not agreed on the record to the terms for the tree cutting assessment. Specifically, the trial court found that the parties did not agree on "the specific deadline for turning in the documentation" to prove the work done and the amount paid and the parties did not agree on a "payment plan for paying back the amount" for tree cutting. VRP (Aug. 29, 2016) at 13-14. With regard to the discussion of the tree cutting assessment when the parties placed their agreement on the record before the court, the parties stated:

> [Respondents' Counsel:]  [Fitzpatrick] agree[s] that they will provide some proof of—that the work was done and what amounts were paid on that—that assessment. And there will be a deadline established. I believe the deadline is still 30 days . . . .
>
> [Fitzpatrick's Counsel]:  Well, no, I—I haven't had a chance to determine that.
>
>        . . . .
>
> [Fitzpatrick's Counsel]:  But I think—if—if—it wouldn't be much longer than 30 days, okay.
>
>        . . . .
>
> [Respondents' Counsel:]  And if that evidence is provided, then the—they'll be— [Respondents] agree that that's a—that they'll make the payments on that and it'll be—there'll be some arrangement made for that to be paid . . . on a monthly basis.

VRP (Nov. 12, 2015) at 3-4. From this record, a court can decide what the terms relating to the tree cutting assessment mean and fix exactly the legal liability of the parties:  Fitzpatrick must provide proof of work done and the amount paid within 30 days, and Respondents would then be obligated make monthly payments for the assessment. Also, the parties agreed that the Declaration of Water Service was a binding agreement between the parties. Paragraph 3.3 of the Declaration of Water Service sets forth the payment requirements for assessments. Thus, there was a meeting

of the minds on these terms relating to the documentation deadline and payment plan relating to the tree cutting assessment. *See Saluteen-Maschersky,* 105 Wn. App. at 851. Therefore, we hold that the trial court erred in concluding that the terms of the assessment for tree cutting had not been agreed to on the record.

ii.  Special assessments

The trial court also found that the parties had not agreed to notice and a payment plan for special assessments. With regard to the discussion relating to special assessments when the parties placed their agreement on the record, the parties stated:

> [Respondents' Counsel:] Any—the special assessments, we're working out some dealing to require that the—the proper notice before the assessment is made, and that there be timely proof of the work being done; that it be limited to a specific time, like perhaps 90—90 days.
>
> . . . .
>
> The Court: All right. And is that your clients [sic] agreement as well?
>
> [Fitzpatrick's Counsel]: Yes.

VPR (Nov. 12, 2015) at 5-6. Based on the record, the parties agreed to a 90-day notice provision for special assessments. And, as noted above, the parties agreed to be bound by the terms of the Declaration of Water Service, which sets for the payment requirements in paragraph 3.3. Therefore, even if there was no separate agreement as to a 90-day notice and payment plan for special assessments, it was not a material term that would undermine the agreement. Thus, we hold that the trial court erred in concluding that the notice and payment plan for special assessments had not been agreed to on the record.

16

iii.  Severability clause

The trial court appears to have found that the parties agreed to a severability clause, but "we don't know what's being severed and not severed." VRP (Aug. 29, 2016) at 15. According to the court, "I'm thinking [Respondents' counsel] is—brought up an issue that I didn't see here at all, and that is if things go south, then they can go back and re-litigate the things that they've already agreed to here." VRP (Aug. 29, 2016) at 15.

In a severability clause, if any part, clause, provision, or condition is held to be void, invalid, or unenforceable, then such provision shall not affect any other part, clause, provision, or condition of the agreement and shall be deemed deleted. The remainder of the agreement shall be effective and shall continue in full force and effect. 7 Wash. Prac., UCC Forms § 1-108. Generally, courts are "loathe to upset the terms of an agreement and strive to give effect to the intent of the parties" especially where the agreement contains a severance clause. *Zuver v. Airtouch Communications Inc.,* 153 Wn.2d 293, 320, 103 P.3d 753 (2004).

Under basic principles of contract law, provisions that are unenforceable can be excluded if there is a severability clause in the contract. Thus, when the parties agreed to a severability clause, they agreed to have severed any provisions found to be unenforceable so as not to upset the other enforceable terms of the agreement. Therefore, we hold that the trial court erred in concluding that "we don't know what's being severed and not severed."

c.  Parties' intent

The parties stated on the record their intent regarding the "binding effect of this agreement on the—the parties." VRP (Nov. 12, 2015) at 6. The parties advised the trial court that they had reached a settlement, Respondents' counsel read the terms into the record, and Fitzpatrick's

counsel affirmed that what Respondents' counsel read into the record was his client's agreement as well.

The attorneys' reading of their CR 2A agreement into the record before the trial court on November 12, 2015 was binding on their clients under RCW 2.44.010 because it was made in open court. The trial court erred in interpreting the agreement reached by the parties; therefore, the trial court's decision to not enforce the CR 2A agreement was manifestly unreasonable. Accordingly, we hold that the trial court abused its discretion in not upholding the CR 2A agreement that was read into the record before the trial court.

      2.      Written Settlement Agreement

Fitzpatrick argues that the trial court erred in not enforcing the written Settlement Agreement. Fitzpatrick contends that the written Settlement Agreement was "presented by the [Respondents] and signed by [Fitzpatrick], which was an offer and acceptance." Br. of App. At 23.

RCW 2.44.010 states:

> An attorney and counselor has authority:
>
> (1) To bind his or her client in any of the proceedings in an action or special proceeding by his or her agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by him or her, or signed by the party against whom the same is alleged, or his or her attorney[.]

Here, Respondents' attorney provided the written agreement to Fitzpatrick, and Fitzpatrick signed the written agreement. But Respondents never signed the written agreement. Thus, Respondents' attorney did not bind his clients to the written agreement in open court, in the

18

presence of the clerk, or by entering it in the minutes of the court as required under CR 2A. Moreover, the parties agreed when they placed their agreement on the record before the trial court that any written agreement would have an effective date of the last signature on the agreement. Thus, we hold that the trial court did not err in finding the written agreement was "not an effective agreement under Civil Rule 2A." VRP (Aug. 29, 2016) at 11.

ATTORNEY FEES ON APPEAL

Respondents request an award of attorney fees for the cost of defending this matter on appeal. Respondents argue that because it was awarded attorney fees in the trial court, it is "entitled to the reasonable costs and fees incurred in defending this matter on appeal." Br. of Resp. at 42-43.

We may grant an award of reasonable attorney fees on appeal to a party that requests it in its opening brief, as long as applicable law provides for such an award. RAP 18.1. RCW 4.84.330 provides that a prevailing party is entitled to attorney fees if the contract which is the subject of the action authorizes such an award. *Marine Enterprises, Inc. v. Security Pacific Trading Corp.*, 50 Wn. App. 768, 772, 750 P.2d 1290 (1988). When both parties to an action are afforded some measure of relief and there is no singularly prevailing party, neither party is entitled to attorney's fees under RCW 4.84.330. *Id*.

Here, because we reverse the trial court's Findings of Fact and Conclusions of Law; Memorandum Decision, Findings of Fact and Conclusions of Law re: Award of Attorney's Fees; and Judgment and Order, and remand to the trial court to enforce the CR 2A agreement read into the record before the trial court, Respondents are not the prevailing party. Therefore, we deny Respondent's request for appellate attorney fees pursuant to RAP 18.1.

19

No. 52984-0-II

## CONCLUSION

We reverse the trial court's Findings of Fact and Conclusions of Law; Memorandum Decision, Findings of Fact and Conclusions of Law re: Award of Attorney's Fees; and Judgment and Order, and we remand to enforce CR 2A agreement that was placed on the record before the trial court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, C.J.

We concur:

Melnick, J.

Glasgow, J.

20